THE STATE OF OHIO, APPELLEE, *v.* PAPP, APPELLANT.

204

(No. 8867—Decided December 29, 1978.)

Mr. Joseph R. Grunda, prosecuting attorney, for appellee.
Mr. Charles F. Adams and Mr. James M. Burge, for appellant.

VICTOR, J. At a retrial ordered by the United States Court of Appeals for the Sixth Circuit, the defendant-appellant, Timothy Papp, was convicted of the murder of Roxie Ann Keathley, age nine years. Specifically, Papp was found guilty of (1) deliberate and premeditated murder; (2) murder in the perpetration of a rape; and (3) rape. This appeal stems from those convictions and the judgments entered thereon. Papp was sentenced to two consecutive terms of life imprisonment.

On the afternoon of March 12, 1973, Roxie Ann Keathley came home from school. She was last seen alone about 5:00 p.m. that same day. A search for the child was made by sheriff's deputies and volunteer searchers, but she could not be found.

Suspicion focused upon the defendant and he was interrogated while in police custody on March 13, March 21, March 23, and March 26, 1973. Based upon information obtained from the defendant during the March 23 interview, the unclothed body of the child was discovered under some leaves in a wooded area about a mile and a half from the child's home. During the interview, defendant broke down and said: "Man, I am sorry, I didn't mean to hurt the little girl."

Papp was formally charged with murder on March 26, 1973, and counsel was appointed for him. New counsel was

appointed on March 29, 1973. Papp was indicted on April 19, 1973.

Prior to trial, a motion to suppress evidence was heard and overruled. Thereafter, the defendant was tried in Lorain County, Ohio, and found guilty as charged. He was sentenced to prison for life on each count with all life terms to run concurrently.

The defendant's conviction was appealed to this court which affirmed the conviction (Ct. of Appeals No. 2180, Lorain County) and the Supreme Court of Ohio denied a motion to certify the record.

Papp then filed a petition for a writ of habeas corpus in the United States District Court on February 26, 1976. That court found that the confession and admissions made by defendant on March 23, 1973, were illegally obtained and involuntary. That court and the Court of Appeals for the Sixth Circuit determined that the writ of habeas corpus must issue unless the defendant was tried within a reasonable time without the use of the statement of March 23, 1973. The state courts also were to determine what evidence, if any, was the fruit of that illegally obtained statement.

The defendant was returned to Lorain County for retrial. A judge from Summit County was assigned to try the case. That judge granted defendant's request for a change of venue and the case was transferred to Summit County. That court determined that the condition of the victim's body, the autopsy report, the photographs of the body and the death certificate were not the fruits of the illegal statement, as the body would have been found notwithstanding the March 23 statement. That evidence was then admitted at trial.

The case was tried to a jury and on March 23, 1978, the defendant was convicted as charged. The defendant chose not to take the stand in his own defense. He was sentenced to life imprisonment on the charge of first degree murder. After examination and evaluation pursuant to R. C. 2947.25, defendant was sentenced to a second life term on the rape charge. The two sentences were ordered to be served consecutively. That conviction and sentence is the subject of this appeal.

We discuss the defendant's first three assignments of error collectively.

"1. The trial court erred by not suppressing evidence of the death of Roxie Ann Keathley and the evidence of the physical condition of the body as 'fruit of the poisonous tree,' obtained in violation of appellant's rights under the Fifth, Sixth and Fourteenth Amendments to the United States Constitution.

"A. The Due Process Clause Exclusionary Rule.

"B. The Fifth Amendment Privilege Against Self-Incrimination Exclusionary Rule.

"C. The Miranda Exclusionary Rule.

"2. The trial court erred by failing to make a substantive determination of what evidence was 'fruit of the poisonous tree.'

"3. The trial court erred by admitting into evidence, at trial, the autopsy, photographs of the body and the death certificate on the mere suggestion that the body would have been found anyway."

On March 12, 1973, nine year old Roxie Ann Keathley returned from school to the apartment complex in which she lived. The defendant, his wife and one child were also residents of the complex.

To obtain spending money, Roxie would go from apartment to apartment asking the residents for their pop bottles. About 3:30 p.m. on March 12, 1973, Roxie and her brother, Sammy, saw the defendant in the parking lot and asked him if he had any pop bottles. The defendant said that he had some, but that Roxie should return later. Instead of returning home to dinner with Sammy, Roxie said she had something else to do. Roxie was last seen alive about 5:00 p.m. on March 12, 1973. A man in a white trench coat was seen talking to Roxie about this time. A white trench coat was found in Papp's apartment but Papp denied ownership of the coat. After searching for Roxie without success during the evening hours of March 12, her mother, Hazel Keathley, called the police about 10:00 p.m. and reported the child missing.

On March 1, 1973, the defendant and one Michael Ratycz saw Roxie playing in the apartment parking lot. Papp said, referring to Roxie, that he would like to have her do a "head job on him."

On Friday, March 9, 1973, James Gregory, an apartment

resident, purchased two footlockers, some dishes and volumes of encyclopedias from Papp. About 1:00 a.m., on March 13, 1973, when Gregory, his wife and another couple were returning to the Gregory apartment, they encountered Papp, who asked Gregory to bring him one of the footlockers. When Gregory said he would return it in the morning, Papp said he needed it immediately as he was taking something to his mother in the morning and apparently needed to pack it then. Gregory went to his apartment and emptied a blue footlocker which was then taken to Papp's apartment. At the time, Papp was living alone because his wife and child had left him on Friday, March 9, 1973. A few days later when the footlocker had not been returned, Gregory asked Papp where it was and Papp said that he had thrown it away but did not say where.

Sometime during the morning of March 13, 1973, Papp asked one Jose S. Mendiola to take him to his mother's house. Jose agreed and Papp then brought a footlocker out of his apartment and put it in the trunk of the Mendiola car. They drove to the Oakwood Shopping Center near where the defendant's mother lived on 40th Street in Lorain, Ohio. Papp alighted from the Mendiola car and took the trunk with him. State's Exhibit 8, the footlocker, was identified by both Gregory and Mendiola.

On March 13, 1973, the defendant voluntarily went to the Lorain County detective bureau. While not under arrest and after being advised of his constitutional rights, Papp agreed to give a statement. He denied any involvement with the missing child. He stated that he had put the trunk behind the Oakwood Shopping Center and agreed to show the detectives the place. The detectives and Papp returned to the place indicated, but the trunk was not to be found. The detectives then returned Papp to his apartment.

On March 23, 1973, at defendant's request, he was again interrogated by detectives concerning his missing wife and child. During the interview, the conversation got around once again to the footlocker. Papp again denied any knowledge about Roxie's disappearance. It was during this interview that Papp gave the incriminating statements later ruled to have been illegally obtained.

Roxie's body was found on March 24, 1973; the trunk was found nearby on March 26, 1973. On March 26, 1973, Papp was charged with Roxie's murder. At that time, Papp had been in jail since March 21, 1973, on a misdemeanor charge filed by his mother-in-law.

On March 26, 1973, Papp requested further conversation with Detective Zieba. *Miranda* warnings were given and while Papp continued to deny any knowledge of Roxie's death, he attempted to implicate Jose Mendiola. During this interview, Papp drew a map showing the location of the trunk which was later discovered.

Experts testifying for the state stated that the blood and hair samples found in the trunk matched the blood and hair samples of Roxie.

After examining the body of Roxie, the Lorain County Coroner, Dr. William E. Kishman, testified as to the bruises around the head area and to abrasions across part of the neck. He testified that the vagina and rectum of Roxie were dilated and much larger than one would expect for a nine year old. His opinion was that this indicated that the child had been sexually assaulted both vaginally and anally prior to her death or while she was in the act of dying. He said her death was caused by strangulation. All testimony relating to the condition of the victim's body, the autopsy report and the death certificate were admitted in evidence over objection.

After March 26, 1973, while in jail awaiting trial, Papp admitted to another inmate, Clark Ashley, that he had intercourse with the child, had strangled her and had then placed her body in a trunk which he then concealed.

The area where the footlocker was found is commonly referred to as Cats Alley. It is an area encompassing approximately ten acres and is owned by the Sacred Heart Roman Catholic Church. State's Exhibit 6 of the suppression hearing of January 24, 1978, is a map of the area. It shows three well-traveled streets are contiguous to the area: Clinton Avenue, Seneca Avenue and 42nd Street. The trunk was found about 300 feet from Clinton Avenue. Seneca Avenue is passable through the area even though not so indicated on the map.

The priest from Sacred Heart Church testified that in the area marked "church property" on this exhibit is the picnic

grounds of the church. He further testified that "the kids are there pretty much year round." Roxie's body was found about 300 feet from Seneca Avenue.

The testimony of Jose Mendez and Loretta Raeburn discloses that people use the area year-round for walking dogs, hunting, family hiking, and ice skating during the winters. Further testimony established that a campground is there and used by the people of the parish and that people going to church often "take the back roads down through there." Some people even drive their cars into the woods to dump trash and refuse. The evidence disclosed that these conditions existed in March 1973, when the footlocker and body were found. Roxie's body was located at the base of a large tree and was covered with leaves and debris. A part of the left buttocks about five inches in diameter was the only part of the body exposed. The distance from the footlocker to the body was approximately 1,000 feet.

Detective Zieba testified at the suppression hearing that initially the search for Roxie began near the child's residence and that all possible areas of search were examined and eliminated. Zieba stated they (the police) would have eventually searched Cats Alley. Had the trunk been found before the body, all efforts would then have been directed from that point to cover the entire area.

Based upon this evidence, we conclude that the trial judge correctly determined that the body would have been found irrespective of the illegal statement taken from Papp on March 23, 1973.

We have no quarrel with, and no citation of authority is required to support, the defendant's contention that evidence obtained in violation of one's Fifth, Sixth and Fourteenth Amendment rights must be excluded from evidence. It likewise follows that all evidence obtained as a result of such illegal activity—the "fruit of the poisonous tree"—must likewise be excluded. See *Silverthorne Lumber Co.* v. *United States* (1920), 251 U. S. 385. However, Justice Holmes declared in *Silverthorne, supra,* at page 392, that:

"***The essence of a provision forbidding the acquisition of evidence in a certain way is that not merely evidence so acquired shall not be used before the Court but that it shall

not be used at all. Of course this does not mean that the facts thus obtained become sacred and inaccessible. If knowledge of them is gained from an independent source they may be proved like any others***." See, also, *Nardone* v. *United States* (1939), 308 U. S. 338.

Thus, if the same facts can be gained from an independent source, untainted by the original illegality, they are admissible.

The substance of the rule, while not a point in issue in the case, was recognized by the court in *Brewer* v. *Williams* (1977), 430 U. S. 387. On its facts, *Brewer, supra,* was similar to the case at bar. The body of a murder victim was found as the result of an illegally obtained confession. The court said in footnote 12, at page 407:

"***While neither Williams' incriminating statements themselves nor any testimony describing his having led the police to the victim's body can constitutionally be admitted into evidence, evidence of where the body was found and of its condition might well be admissible on the theory that the body would have been discovered in any event, even had incriminating statements not been elicited from Williams. Cf. *Killough* v. *United States,* 119 U. S. App. D. C. 10, 336 F. 2d 929. In the event that a retrial is instituted, it will be for the state courts in the first instance to determine whether particular items of evidence may be admitted."

In light of *Brewer, supra,* the Court of Appeals for the Sixth Circuit in *Papp* v. *Jago* (C.A. 6, No. 76-1402, June 14, 1977), unreported, certiorari denied 434 U. S. 943 (1977), in affirming the United States District Court, *Papp* v. *Jago* (S. D. Ohio, No. C-1-75-301, February 19, 1976), unreported, with modification, determined that while the unconstitutionally obtained confession made by Papp on March 23, 1973, must be excluded, "the determination of what other evidence must also be excluded as 'fruit of the poisonous tree' ***[was] a matter for determination in the first instance by the state courts of Ohio." We do not read this order to mean or imply that evidential fruit did exist which must be excluded, but rather that the Ohio courts were simply to determine if any such "fruit" did exist. The trial court determined that the condition of the body, the autopsy and certificate of death were not the "fruits of the poisonous tree," as the body would have

been discovered without the illegal confession of March 23, 1973. Papp further argues that, assuming *arguendo,* the body might have been found at some time, this evidence must still be excluded because the body would not have been discovered within the time frame that it was discovered, "but for" the March 23, 1973, confession. Thus, Papp argues that the body would have eventually decomposed and it would have been impossible to make a medical determination that a rape had been committed by the defendant. This is a factual issue to be determined by the trial court. The record warranted its resolution against the defendant.

In *Papp* v. *Jago* (S. D. Ohio, No. C-1-75-301, February 19, 1976), unreported, the court ruled that the statement made by Papp on March 26, 1973, was admissible. The court went on to say "it follows that any evidence obtained as a result of such statements is likewise admissible. That would include the trunk and its contents." Having discovered the trunk, the area surrounding it would have been thoroughly searched immediately thereafter; and it is reasonable to assume the body of Roxie would have been found within a matter of hours.

We reject the defendant's first three assignments of error.

### Assignment of Error 4

"The trial court erred by failing to declare a mistrial and to grant appellant a new trial on the basis of the continuous course of misconduct and prejudicial remarks by the prosecutor, made in violation of appellant's right to due process under the Fourteenth Amendment to the United States Constitution."

Papp contends that the prosecutor's improper remarks, from *voir dire* to closing argument, attempted to convict defendant because of his size; attempted to debunk the presumption of innocence; expressed the prosecutor's own opinion of the defendant's guilt; resorted to profanity; and accused defense counsel of intentionally placing a witness on the stand for the purpose of eliciting prejudicial testimony.

The conduct of a prosecuting attorney during trial cannot be made a ground of error unless that conduct deprives the defendant of a fair trial. *State* v. *Wade* (1978), 53 Ohio St. 2d 182; *State* v. *DeNicola* (1955), 163 Ohio St. 140; and *Scott* v.

*State* (1923), 107 Ohio St. 475. We have carefully examined this record of over 1,000 pages and find that while some of the comment was unnecessarily coarse, it did not deprive the defendant of a fair trial. The conduct and remarks of the prosecutor, despite their lack of grace, were warranted by the evidence adduced. We reject this assignment of error.

### Assignment of Error 5

"The trial court erred in not declaring a mistrial when the prosecutor made reference to appellant's failure to take the stand and testify."

The prosecutor said in closing:

"***Look at him looking. Won't even own up. He is guilty ladies and gentlemen, of killing that little girl and raping her."

No objection was made to these comments. Nevertheless, if such statements can be considered as a comment upon the failure of the defendant to testify, plain error may be manifest. See *United States* v. *Chaney* (C. A. 3, 1971), 446 F. 2d 571, certiorari denied 404 U. S. 993 (1971). Statements made by a prosecutor to the effect that the evidence against a defendant was "uncontradicted and unrefuted" do not constitute a comment by the prosecutor upon the failure of the defendant to testify, prejudicial to his right to a fair trial. *State* v. *Lockett* (1976), 49 Ohio St. 2d 48, 65. See, also, *State* v. *Wade, supra.* These comments, like those in *Lockett* and *Wade, supra,* reflect that the evidence of the defendant's guilt stands uncontradicted. We reject this assignment of error.

### Assignment of Error 6

"The trial court erred in admitting into evidence State's Exhibit 1, a photograph which featured appellant in handcuffs, a body belt and prison clothes, flanked by two sheriff's deputies."

This photograph was used for the purpose of identifying the defendant as he appeared in 1973, six feet two inches in height and weighing 250 pounds. The defendant's appearance at trial was substantially different. While the belt area was masked, Papp contends that the masking itself draws attention to the very area sought to be masked.

It has been held that the admission into evidence of "mug shots" does not amount to an abuse of discretion when (1) the

state has a need to introduce the photographs; (2) the photographs do not imply that the defendant had a prior criminal record; and (3) the manner of introduction does not draw particular attention to the source or implications of the photographs. *United States* v. *Fosher* (C. A. 1, 1978), 568 F. 2d 207. State's Exhibit 1 is not a "mug shot" under the ordinary meaning attributed to that appellation. However, we shall use these rules in our determination of the admissibility of State's Exhibit 1.

The gross difference between the size and weight of the victim and the defendant was an important part of the state's case. While oral testimony had been introduced to establish the defendant's size and weight in 1973, one witness, Judy Kamtsiklis, was unable to identify the defendant in open court because of his changed appearance. Photographs, although cumulative, may be introduced to firmly establish identification. *United States* v. *Fosher, supra.*

The exhibit could not possibly lead the jury to believe that Papp had a prior criminal record. The jury was well aware that it was sitting on a retrial of the case which had originated in 1973 when the photograph was taken. Additionally, nothing in the technique covering the admission of the exhibit into evidence could arouse any suspicion relative to the source or implications of the photograph, itself. For these reasons, we reject Assignment of Error Six.

### Assignment of Error 7

"The trial court erred in admitting into evidence, over objection, certain slides contained in State's Exhibit 43, numbers 1 through 29, autopsy photos, in that they are gruesome, revolting, inflammatory, unnecessary to prove the *corpus delicti* of the offense, and were offered solely to arouse passion and prejudice."

We reject this assignment of error. The exhibits were of probative value in establishing that Roxie had been sexually assaulted.

### Assignment of Error 8

"The trial court erred in sentencing appellant to two consecutive terms of life in prison, since after his first trial, he was sentenced to serve concurrent life terms and there was

no affirmative showing by the State or by the court that a more severe penalty was justified.''

A more severe sentence on retrial is constitutionally permissible, provided that ''whenever a judge imposes a more severe sentence upon a defendant after a new trial, the reasons for doing so must affirmatively appear. Those reasons must be based upon objective information concerning identifiable conduct on the part of the defendant occurring after the time of the original [sentence.]'' *North Carolina* v. *Pearce* (1969), 395 U. S. 711, 726.

At the time of sentence, the trial judge gave no reasons why he was imposing a more severe penalty than before. After the issue was raised on appeal, the judge submitted his affidavit stating his reasons. In part, the affidavit states:

''Affiant says further that on April 25, 1978, he sentenced Defendant for the crime of Rape of Female Under Twelve, Ohio Revised Code Section 2905.02, for the remainder of his natural life and such sentence is to run consecutively with the life sentence imposed in Count One on March 24, 1978.

''Affiant says further that the reason for said sentence is that I have come to believe, based on the testimony of the witnesses at trial, the pretrial hypnotic sessions, and the presentence and psychiatric reports, that this Defendant is an assaultive type and a chronic liar. The Defendant apparently faked hypnosis and while doing so implicated an independent third party as the murderer. Not only did he blame this party, but the same was publicized throughout the state causing that party great harm. \* \* \* Based upon the aforementioned, the brutal nature of the slaying and the fact that the Defendant has shown no remorse for his actions, I conclude that the sentence imposed at the first trial was less that this Defendant deserved. Also, I want to make it clear that the imposition of the more severe sentence is not to be taken as punishment for the Defendant's exercise of his constitutional rights.''

This affidavit is not a part of the record on appeal pursuant to App. R. 9(A). However, precedent for such procedure is found in *Moon* v. *Maryland* (1970), 398 U. S. 319, where the affidavit of the trial judge was affixed as an appendix to the brief of the respondent. We shall likewise consider it, and we determine that in our judgment it meets the standards enunciated in *Pearce, supra.*

We reject this assignment of error.

The defendant's trial was not a perfect trial, but it was a fair trial, free from prejudicial error. Accordingly, we affirm the judgment.

*Judgment affirmed.*

HUNSICKER, J., concurs.

MAHONEY, P. J., dissents as to Assignment of Error 8, but concurs in all other respects.

HUNSICKER, J., retired, was assigned to active duty under authority of Section 6(C), Article IV, Constitution.